Gabriel ALVAREZ, individually and as class representative; Ranulfo Gutierrez, individually and as class representative; Pedro Hernandez, individually and as class representative; Maria Martinez; Ramon Moreno; Ismael Rodriquez, Plaintiffs–Appellees,

v.

IBP, INC., a Delaware corporation, Defendant–Appellant.

Gabriel Alvarez, individually and as class representative; Ranulfo Gutierrez, individually and as class representative; Pedro Hernandez, individually and as class representative; Maria Martinez; Ramon Moreno; Ismael Rodriquez, Plaintiffs–Appellants,

v.

IBP, Inc., a Delaware corporation, Defendant Appellee.

Nos. 02–35042, 02–35110.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted April 8, 2003.

Filed Aug. 5, 2003.

Michael B. King, Barbara J. Duffy, Douglas E. Smith, Nancy W. Anderson; Lane Powell Spears Lubersky LLP; Seattle, WA; and William A. Norris, Joel M. Cohn and Alison L. Gray; Akin Gump Strauss Hauer & Feld LLP; Los Angeles CA; for the appellant.

William Rutzick and Kathryn Goater; Schroeder, Goldmark & Bender; and David Mark; Seattle, WA; for the appellees.

Ellen R. Edmond, United States Department of Labor; Washington, DC, for amicus U.S. Department of Labor.

Suchi Sharma; Assistant Attorney General, State of Washington; Olympia, WA; for amicus Washington Department of Labor and Industries.

Before D.W. NELSON, THOMAS, Circuit Judges, and ILLSTON, District Judge.[1]

THOMAS, Circuit Judge.

Perhaps the packing plant employees in Pasco, Washington, should have heeded Henry David Thoreau's warning to "beware of all enterprises that require new clothes." The central dispute in this class action lawsuit is whether IBP, Inc. ("IBP") should be required to compensate its employees for the time it takes to change into required specialized protective clothing and safety gear. Under the circumstances presented by this case, we conclude that it must. We affirm in part and reverse in part.

I

From the time that publication of Upton Sinclair's novel *The Jungle* provoked Pres-

---

1. The Honorable Susan Y. Illston, United States District Judge for the Northern District of California, sitting by designation.

ident Theodore Roosevelt to secure passage of the Meat Inspection Act of 1906, the meat packing industry has been one of the most regulated businesses in the United States. This is not only a product of concerns over food purity. According to the United States Department of Labor's Bureau of Labor Statistics, employment at a packing plant is still one of the most dangerous jobs in America, with multiple thousands of workers injured on the job every year. *See* U.S. Dep't of Labor, Bureau of Labor Statistics, *Industry Injury and Illness Data* (2002), *at* http://www.bls.gov/iif/oshsum.htm.

IBP, Inc. is the world's largest producer of fresh beef, pork, and related products. Headquartered in Dakota Dunes, South Dakota, IBP operates a number of meat processing plants throughout the American West and Midwest. Through meat-related innovation and gradual corporate acquisition, IBP has built a substantial food empire, reaping over $13 billion in sales in 1999 alone.

Among IBP's many meat processing facilities is a "kill and processing plant" in Pasco, Washington ("the Pasco plant"). As the moniker suggests, the Pasco plant includes slaughter and processing work sections, both of which play a direct role in the carcass "disassembly process." The disassembly of a beef carcass takes two-to-three days. After the animal is killed, the carcass moves along a series of chains in the slaughter division, eventually coming to rest in a cooled storage facility. After remaining in storage for at least twenty-four but no more than forty-eight hours, the carcass is transported across a group of chains and belts in the processing division, where processing employees cut, trim, and divide the carcass into a variety of pieces.

The Pasco plant divides its slaughter and processing staffs into separate work crews, assigning these crews to work shifts. Pasco plant production line employees, who are represented by Teamsters Local Union No. 556 and who are covered by a collective bargaining agreement, are required to be at their work stations and prepared to work as the first piece of meat comes across the production line. However, before they are able to assume their work stations all Pasco plant employees must complete a number of preliminary tasks, and before employees may leave the Pasco plant at the end of a shift, most of these preliminary tasks must be completed in inverse form. Each Pasco plant job classification has specific tool, supply, walk-time, and gear requirements, so each employee's preliminary and postliminary duties are somewhat distinct; still, for all Pasco plant production line employees, a general pattern obtains: At the start of a shift, Pasco plant employees must gather their assigned equipment, don that equipment in one of the Pasco plant's four locker rooms, and prepare work-related tools before venturing to the slaughter or processing floors. At the end of every shift, employees must clean, restore, and replace their tools and equipment, storing all of it at the Pasco plant itself.[2]

**2.** The record is replete with lists of outer garments and protective equipment the Pasco plant employees must don and doff. The district court's findings of fact on this point are thorough. In sum, all employees must wear a sanitary outer garment that is provided and washed each night by IBP; all employees must wear some form of a plastic hardhat, a hair net, and ear plugs, and all employees— save "gutter" employees in the slaughter division—must wear a face shield or safety goggles; all employees wear some sort of glove, with most processing employees using a number of sets per day of grip-facilitative and warmth-providing "yellow cotton gloves," and with some slaughter employees donning these yellow gloves and/or plastic or rubber gloves for enhanced grip and protection

Until July of 1998, the Pasco plant's shifts ran eight hours, the first four-hour block of which was split by a paid fifteen-minute rest-break, and the two four-hour spans of which were divided by a thirty-minute unpaid meal break.[3] In July of 1998, IBP restructured its shift time to include four minutes of so-called "clothes" time, thereby reducing the overall work time to seven hours and fifty-six minutes. In the fall of 1999, the Pasco plant reduced its shift time to seven hours and fifty-one minutes. Long-running litigation between IBP and the United States Department of Labor (hereinafter "USDOL") in the 1990s spurred much of IBP's shift-time reduction. In the course of that litigation, damage and wage issues comparable to those raised in this case were decided, but the litigation focused singularly on IBP's non-unionized plants. *See Reich v. IBP, Inc.*, 38 F.3d 1123, 1127 (10th Cir.1994) (holding IBP liable for unpaid pre-shift and post-shift donning, doffing, and cleaning of special packinghouse industry safety equipment and for time spent between waiting to pick up and return knives).[4]

Once a shift begins, the Pasco plant employees' time is strictly regulated and monitored. As a rule, employee rest or meal-break time begins as soon as the last piece of meat passes on the production line, and, as a rule, employees must be completely prepared to resume work as soon as the break period ends. When departing the processing and slaughter floors—whether to go to the cafeteria or to the restroom[5]—employees are permitted to leave only hats, hairnets, goggles, earplugs, and boots in place; outer garments, protective gear, gloves, scabbards, and chains must be removed. For many Pasco plant employees, the operation of IBP's mandatory donning and doffing rules necessarily impinges—if not more—their unpaid thirty-minute meal break time.

To help monitor employee arrival and departure times, IBP instituted a mandatory, computerized "swipe card" system at the Pasco plant. IBP does not use the data its swipe card system gathers in calculating employee pay. Instead, IBP pays its Pasco plant employees according to a "gang time pay" model, which bases em-

against blood and water saturation; all employees wear liquid-repelling sleeves, aprons, and leggings; all employees wear safety boots/shoes, all of which must be wiped/hosed after the end of a shift; and many employees opt to wear weight-lifting-type belts to prevent back injury. In addition, so-called "knife users" don an assortment of protective gear on their hands, arms, legs, and torsos; this gear often constitutes chain-link (i.e., "mesh") metal aprons, leggings, vests, sleeves, and gloves, and plexiglass arm guards, Kevlar gloves (that is, "can't cut" or "Polar" gloves), and puncture-resistant protective sleeves.

3. In the early 1970's, the Pasco plant's first proprietor, Columbia Foods, entered a collective bargaining agreement with the union in which employees were allotted thirty minutes per week for "clothes changing." In 1976, IBP purchased the Pasco plant from Columbia Foods, and included a similar "clothes changing" provision in the 1979 iteration of

the bargaining agreement. In the 1982, 1986, 1992, and current versions of the collective bargaining agreement, however, "clothes changing time" was negotiated but excluded.

4. Apparently as a consequence of IBP's decision to relocate its knife distribution areas and to reposition sinks along its production line, IBP and USDOL agreed to lower an initial fourteen-minute figure to four minutes in 1998. In April 1998, the Department of Labor filed a second complaint against IBP, seeking back pay for post-*Reich* FLSA violations at IBP's non-unionized plants. *See Herman v. IBP*, 98–CV–2163–JWL (D.Kan.).

5. IBP "strongly encourages" its employees to use the restroom only during unpaid meal break time, expressly limiting non-break-time restroom use to situations of emergency. "Such emergencies," IBP instructs its employees, "should seldom occur."

ployee remuneration entirely on the times during which employees are actually cutting and bagging meat. Under this "gang time" framework, the period in which IBP considers its employees to be performing compensable work commences with the processing of the first piece of meat and ends with the processing of the last, notably excluding any time spent abiding the Pasco plant's required pre or post-shift routines.

In 1999, believing parts of IBP's compensation practices to be unlawful, the Pasco plant's slaughter and processing employees brought this class action suit under § 16(b) of the Fair Labor Standards Act ("FLSA"), see 29 U.S.C. § 216(b) (1999), and related provisions of Washington's Minimum Wage Act ("WMWA") in United States District Court for the Eastern District of Washington. Three aspects of their work-day animated plaintiffs' claim: (1) the pre-shift donning of protective gear and the preparation of work-related tools, including the attendant waiting and walking; (2) the requisite donning and doffing of protective gear during the thirty-minute unpaid meal-break; and (3) the post-shift doffing, cleaning, and storing of protective gear and tools.

In response to plaintiffs' complaint, IBP promptly filed a motion for summary judgment with the district court, raising a series of interrelated state and federal defenses to plaintiffs' claims. Rejecting IBP's Labor Management Relations Act preemption theory, the district court granted in part and denied in part IBP's first summary judgment motion.

Just over a year later, the district court denied another of IBP's motions for summary judgment, concluding that Washington state courts were "likely" to adopt a per-hour standard of minimum wage compliance under the WMWA because (1) the Washington legislature refused to incorpo-

rate correlative FLSA language, thereby refusing to adopt FLSA's uniform application of the workweek standard, and (2) the Washington Supreme Court had condoned the use of a per-hour method in *Seattle Professional Engineering Employees Association v. Boeing Co.*, 139 Wash.2d 824, 991 P.2d 1126 (2000), placing that court's imprimatur on a non-workweek approach in certain contexts.

A month later, the district court issued a multi-part order, excluding plaintiffs from the ambit of the Revised Code of Washington § 49.46.130(2)(g)(ii)'s exemption of "agricultural workers" from Washington's forty-hour week rule, finding IBP's potentially willful violation of plaintiffs' rights preclusive of summary judgment on plaintiffs' exemplary damage claim, declaring IBP's putative good faith too dubious to allow summary judgment, and rejecting IBP's efforts to import the holding of *Reich*, 38 F.3d at 1123, wholesale regarding what activities are and are not compensable. A twenty-day bench trial followed.

In spring of 2001, plaintiffs filed a particularized motion for reconsideration, targeting the district court's grant of IBP's motion for summary judgment on their separate Washington Administrative Code § 296–126–092 (1999) rest-break claim. Citing the Washington Court of Appeals' location of an implied cause of action for such claims in *Wingert v. Yellow Freight Systems, Inc.*, 104 Wash.App. 583, 13 P.3d 677 (2001), *aff'd*, 146 Wash.2d 841, 50 P.3d 256 (2002), the district court granted plaintiffs' motion to reconsider and reversed its prior implied right of action decision.

Soon thereafter, the district court conducted a hearing on trial objections, and, weeks later, the district court memorialized its myriad conclusions in another multi-part order. In pertinent part, the district court permitted plaintiffs to recover

pay on their state meal-break claim for each minute of break time lost up to ten minutes, granting a full thirty-minute award to those losing any more than ten minutes; endeavored to calculate damages along the narrowest and most accurate job categories possible; found plaintiffs' trial testimony adequate to establish what equipment in addition to IBP's job-specific lists was "integral and indispensable" to particular job classifications; and, for most Pasco employees, declared the first "compensable activity" to be the donning of protective gear and the last compensable activity to be the doffing of that gear, thus including in the district court's aggregate "compensable" period time spent walking to and from locker room and work station, time spent donning and doffing gear in order to comply with IBP's meal and rest-break exit and entry requirements, and time devoted to waiting for, preparing, handling, replacing, and washing "compensable" equipment.

To similar effect, on September 14, 2001, the district court issued thorough findings of fact and conclusions of law. On plaintiffs' federal law claims, the district court applied 29 U.S.C. § 255(a)'s three-year statute of limitations, also finding that the representative evidence adduced by the plaintiffs adequately and accurately supported a damage award for all plaintiffs, notwithstanding somewhat discrepant job-specific donning and doffing rates, and concluding that FLSA required compensation[6] for all of plaintiffs' work time—e.g., donning, doffing, and cleaning of "integral and indispensable" protective gear; waiting and some walking time during the workday—both during pre-shift and post-

shift times and during the thirty-minute meal-break.

On plaintiffs' state law claims, the district court again rejected IBP's preemption theses, determining IBP to have infringed plaintiffs' right to be paid for all hours worked under Revised Washington Code §§ 49.46.020 and 49.46.030 (1999), and finding IBP to have violated plaintiffs' state law rights vis-a-vis meal-break time and second rest-break time, paralleling FLSA in assigning damages for the state meal-break claim.

The district court also rejected IBP's state-law and FLSA-based defenses. On the former, the district court determined that the Washington Supreme Court's decision in *Inniss v. Tandy Corp.*, 141 Wash.2d 517, 7 P.3d 807 (2000) (En Banc), did not mandate adoption of the workweek standard as a matter of state law for hourly employees. On the latter, the district court found that 29 U.S.C. § 203(*o*) (1999), which excludes "clothes changing" and "washing" time from compensable time when these activities are the subject of collective bargaining, offered IBP no relief because § 203(*o*)'s "changing clothes" and "washing" exclusions did not reach donning, doffing, and cleaning of specifically protective, non-clothing-like gear; that IBP lacked "good faith"; and that the Portal–to–Portal Act did not operate to plaintiffs' disadvantage because the donning, doffing, and cleaning of protective gear was "integral and indispensable" to their jobs, fulfilling mutual obligations of employer and employee. Walking and waiting time, the district court continued, occurred during the principal workday and was thus compensable.

---

**6.** In contrast, as non-compensable "work," the district court listed donning and doffing of non-protective gear (e.g., hard-hats, frocks, ear plugs, safety goggles, and hair nets as non-protective gear), finding it concomitantly less-than-integral to the job and demanding of only *de minimis* time.

For IBP's FLSA and state-law violations, the district court awarded plaintiffs liquidated damages, a measure of "double" (i.e., exemplary) damages with regard to plaintiffs' state meal-break claims, and prejudgment interest. Over the next few months, the district court denied plaintiffs' motion for injunctive relief, conducted a hearing on plaintiffs' motion for fees and sanctions, and memorialized its fee hearing decisions in a thoroughgoing Order.[7] In its fee Order, the district court denied IBP's Federal Rules of Civil Procedure 52 and 59 motions and denied plaintiffs' motion to strike certain aspects of the record. Both IBP and plaintiffs filed timely notices of appeal. We have jurisdiction under 28 U.S.C. § 1291.

## II

█ It is axiomatic, under the FLSA, that employers must pay employees for all "hours worked." *See* 29 U.S.C. §§ 206, 207 (1999); *Turner v. City of Philadelphia*, 262 F.3d 222, 224 (3d Cir.2001). The threshold question in this case is whether the activities cited by the plaintiffs—donning and doffing, waiting and walking—constitute "work" under the FLSA. We agree with the district court that, under the facts presented by this case, they do.

█ "Work," the Supreme Court has long noted, is "physical or mental exertion (whether burdensome or not) controlled or required by the employer and pursued necessarily and primarily for the benefit of the employer." *See Tenn. Coal, Iron & R. Co. v. Muscoda Local No. 123*, 321 U.S. 590, 598, 64 S.Ct. 698, 88 L.Ed. 949 (1944). Definitionally incorporative, *Muscoda's* "work" term includes even non-exertional acts. *See Armour & Co. v. Wantock*, 323 U.S. 126, 133, 65 S.Ct. 165, 89 L.Ed. 118 (1944) (noting that even "exertion" is not the *sine qua non* of "work" because "an employer ... may hire a man to do nothing, or to do nothing but wait for something to happen").

Plaintiffs' donning and doffing, as well as the attendant retrieval and waiting, constitute "work" under *Muscoda* and *Armour's* catholic definition: "pursued necessarily and primarily for the benefit of the employer," *Muscoda*, 321 U.S. at 598, 64 S.Ct. 698, these tasks are activity, burdensome or not, performed pursuant to IBP's mandate for IBP's benefit as an employer. 323 U.S. at 133, 65 S.Ct. 165, 321 U.S. at 598, 64 S.Ct. 698. The activities, therefore, constitute "work."

That such activity is "work" as a threshold matter does not mean without more that the activity is necessarily compensable. The Portal–to–Portal Act of 1947 relieves an employer of responsibility for compensating employees for "activities which are preliminary or postliminary to [the] principal activity or activities" of a given job. 29 U.S.C. § 254(a) (1999). Not all "preliminary or postliminary" activities can go uncompensated, however. "[A]ctivities performed either before or after the regular work shift," the Supreme Court has noted, are compensable "if those activities are an integral and indispensable part of the principal activities." *Steiner v. Mitchell*, 350 U.S. 247, 256, 76 S.Ct. 330, 100 L.Ed. 267 (1956); *see also Mitchell v. King Packing Co.*, 350 U.S. 260, 261, 76 S.Ct. 337, 100 L.Ed. 282 (1956); 29 C.F.R. § 790.7(h) (1999) ("[A]n activity which is a 'preliminary' or 'postliminary' activity under one set of circumstances may be a principal activity under other conditions.").

█ The Supreme Court's approach to this "principal," "integral and indispensable" duty question is context-specific. To be "integral and indispensable," an activity

---

7. Neither party has challenged any aspect of the district court's fee decision.

must be necessary to the principal work performed and done for the benefit of the employer. *See Barrentine v. Arkansas–Best Freight Sys., Inc.,* 750 F.2d 47, 50 (8th Cir.1984), *cert. denied,* 471 U.S. 1054, 105 S.Ct. 2116, 85 L.Ed.2d 480 (1985); *Dunlop v. City Elec., Inc.,* 527 F.2d 394, 398 (5th Cir.1976). Plaintiffs' donning and doffing of job-related protective gear satisfies *Steiner*'s bipartite "integral and indispensable" test.

First, because the donning and doffing of this gear on the Pasco plant's "premises is required by law, by rules of [IBP], [and] by the nature of the work," *see* 29 C.F.R. § 790.8(c) n.65 (1999), this donning and doffing is "necessary" to the "principal" work performed. From sanitary aprons to metal-mesh gear, IBP "by rule[ ]," *id.,* mandates the donning and doffing of clothes and gear at various intervals throughout the workday, requiring employees to wait for and to retrieve that gear in particular areas at particular times on the Pasco plant's premises. *See Steiner,* 350 U.S. at 256, 76 S.Ct. 330. United States Department of Agriculture sanitation standards and Occupational Safety and Health Administration (hereinafter "OSHA") industry standards bolster this "by rule" conclusion, demanding maintenance of sanitary conditions, 9 C.F.R. § 308.3, and the provision of protective equipment at the Pasco plant "wherever[ ][ ] necessary by reason of hazards or processes of [work] environment." 29 C.F.R. § 1910.132(a) (1999).

Second, it is beyond cavil that the donning, doffing, washing, and retrieving of protective gear is, at both broad and basic levels, done for the benefit of IBP. *See generally United Transp. Union Local 1745 v. City of Albuquerque,* 178 F.3d 1109, 1116 (10th Cir.1999). These plaintiff-performed activities allow IBP to satisfy its requirements under the law, *see* 9

C.F.R. § 308.3 (1999); 29 C.F.R. § 1910.132(a) (1999), and these activities prevent unnecessary workplace injury and contamination, both of which would inevitably impede IBP's "disassembly" process. Under *Steiner,* plaintiffs' donning, doffing, and cleaning activities are "integral and indispensable" to Pasco's "principal" activity.

This "integral and indispensable" conclusion extends to donning, doffing, and cleaning of non-unique gear (e.g., hardhats) and unique gear (e.g., Kevlar gloves) alike. Little time may be required to don safety glasses and the use of safety goggles is undoubtedly pervasive in industrial work. But ease of donning and ubiquity of use do not make the donning of such equipment any less "integral and indispensable" as that term is defined in *Steiner.* Safety goggles are, like metal-mesh leggings, required by IBP, and they are, like metal-mesh leggings, necessary to the performance of the principal work. Both are "integral and indispensable" under *Steiner*'s exception to the Portal–to–Portal Act's bar to compensation of preliminary or postliminary activity.

However, we agree with the district court's alternative conclusion as to why the time spent donning and doffing non-unique protective gear such as hardhats and safety goggles is not compensable: The time it takes to perform these tasks vis-a-vis non-unique protective gear is *de minimis* as a matter of law. "As a general rule," we have noted, "employees cannot recover for otherwise compensable time if it is *de minimis.*" *Lindow v. United States,* 738 F.2d 1057, 1061–62 (9th Cir.1984). "When the matter in issue concerns only a few seconds or minutes of work beyond the scheduled working hours," the Supreme Court has observed, "such trifles may be disregarded[, for] [s]plit-second absurdities are not justified by the actualities or working

conditions or by the policy of the [FLSA]." *Anderson v. Mt. Clemens Pottery Co.*, 328 U.S. 680, 692, 66 S.Ct. 1187, 90 L.Ed. 1515 (1946). As the Tenth Circuit posited in an alternative conclusion in *Reich*, time spent donning and doffing non-unique protective gear, "although essential to the job[ ] and required by the employer," is at once so insubstantial and so difficult to monitor that it "is *de minimis* as a matter of law." 38 F.3d at 1126 & n. 1.

We agree with this conclusion, both as a matter of logic and as a matter of law. While we do not suggest that the donning of such gear is "trifl[ing]," *see Mt. Clemens*, 328 U.S. at 692, 66 S.Ct. 1187, we do believe that neither FLSA policy nor "the actualities" of plaintiffs' working conditions justify compensation for the time spent performing these tasks. Accordingly, donning and doffing of all protective gear is integral and indispensable to "the principal activities for which [the plaintiffs] are employed," *Steiner*, 350 U.S. at 256, 76 S.Ct. 330, and generally compensable. However, the specific tasks of donning and doffing of non-unique protective gear such as hardhats and safety goggles is noncompensable as *de minimis*. *Lindow*, 738 F.2d at 1061.

In sum, we agree with the district court's conclusion, but for different reasons in part. In this context, "donning and doffing" and "waiting and walking" constitute compensable work activities except for the *de minimis* time associated with the donning and doffing of non-unique protective gear.

### III

■ The FLSA contains an exception for "any time spent in changing clothes" that was excluded from compensation under "the express terms of or by custom or practice under a bona fide collective-bargaining agreement." 29 U.S.C. § 203(*o*) (1999) (hereinafter " § 3(*o*)"). IBP argues that, even if compensable in a general sense, the time employees spend donning and doffing protective gear is non-compensable under the "changing clothes or washing" exclusion.

Section 3(*o*) reads in pertinent part:

*Hours Worked.*—In determining for the purposes of sections 206 and 207 ... the hours for which an employee is employed, there shall be excluded any time spent in changing clothes or washing at the beginning or end of each workday which was excluded from measured working time during the week involved by the express terms of or by custom or practice under a bona fide collective-bargaining agreement applicable to the particular employee.

*Id.*

Distilled to its essence, this case requires us to decide whether putting on and taking off protective gear constitutes "changing clothes" as that phrase is used in the statute. Neither § 3(*o*) nor its legislative history defines the phrase, and no case law assesses the precise question we address here. *See, e.g., Nguyen v. Excel Corp.*, 197 F.3d 200, 203 (5th Cir.1999) (noting that plaintiffs raised a similar § 3(*o*) safety gear claim but not reaching the issue). In light of this doctrinal, statutory, and legislative lacunae, we give the relevant language its "ordinary, contemporary, common meaning." *United States v. Akintobi*, 159 F.3d 401, 403 (9th Cir.1998) (internal quotation marks omitted) (quoting *Perrin v. United States*, 444 U.S. 37, 42, 100 S.Ct. 311, 62 L.Ed.2d 199 (1979)).

The parties posit various dictionary definitions and regulatory references, mostly confined to discussing the etymology of the word "clothes" and, in particular, its commonly understood meaning during the year in which § 3(*o*) was adopted. IBP

argues that "clothes" must mean "whatever is worn as covering for the human body," citing *Webster's New International Dictionary of the English Language* 507 (2d ed. unabridged 1939). IBP's construction would embrace any conceivable matter that might adorn the human body, including metal-mesh leggings, armor, spacesuits, riot gear, or mascot costumes. Citing the same dictionary source, plaintiffs contend that the meaning of the word is limited to covering worn "for decency or comfort." *Id.*

▉ Viewed in statutory context, it is evident that the phrase "changing clothes" was not employed in the expansive fashion urged by IBP. First, FLSA exemptions, the Supreme Court has long counseled, "are to be narrowly construed against the employers seeking to assert them." *Arnold v. Ben Kanowsky, Inc.*, 361 U.S. 388, 392, 80 S.Ct. 453, 4 L.Ed.2d 393 (1960) (citing *Mitchell v. Kentucky Fin. Co.*, 359 U.S. 290, 295, 79 S.Ct. 756, 3 L.Ed.2d 815 (1959)); *see also Auer v. Robbins*, 519 U.S. 452, 462, 117 S.Ct. 905, 137 L.Ed.2d 79 (1997). Following the Supreme Court's lead, we have also read FLSA exemptions—such as § 3(*o*)—tightly, refusing to apply FLSA exemptions "except [in contexts] *plainly and unmistakably* within the[ ] [given exemption's] terms and spirit." *Klem v. County of Santa Clara*, 208 F.3d 1085, 1089 (9th Cir.2000) (internal punctuation omitted; emphasis added); *see also Do v. Ocean Peace, Inc.*, 279 F.3d 688, 691 (9th Cir.2002); *Dole v. W. Extension Irr. Dist.*, 909 F.2d 349, 351 (9th Cir.1990). The protective gear at issue does not "plainly and unmistakably" fit within § 3(*o*)'s "clothing" term. Absent such a plain and clear § 3(*o*) fit, *Arnold* requires that we construe § 3(*o*)'s against the employer seeking to assert it. 361 U.S. at 392, 80 S.Ct. 453. Thus, the exemption must be construed against IBP.

Second, and perhaps more importantly, specialized protective gear is different in kind from typical clothing. The admonition to wear warm clothing, for example, does not usually conjure up images of donning a bullet-proof vest or an environmental spacesuit. Rather, personal protective equipment generally refers to materials worn by an individual to provide a barrier against exposure to workplace hazards. OSHA has recognized the difference in its regulations defining "personal protective equipment":

> Personal Protective Equipment is specialized clothing or equipment worn by an employee for protection against a hazard. General work clothes (e.g. uniforms, pants, shirts or blouses) not intended to function as protection against a hazard are not considered to be personal protective equipment.

29 C.F.R. § 1910.1030(b) (1999).

Of course, this OSHA definition was promulgated in a different context. Nonetheless, it provides a useful analytic distinction.[8] It also underscores the fact that, from both a regulatory and common sense perspective, "changing clothes" means something different from "donning required specialized personal protective equipment." In short, the district court correctly interpreted the "changing clothes" exception in § 3(*o*) as not including the time spent putting on personal protective equipment.[9]

---

**8.** In the context of § 3(*o*), the distinction makes particular sense because the section makes the time spent "changing clothes" the proper subject of collective bargaining, whereas it would not be in the interest of public policy to allow disincentives for employers and employees to use government-mandated personal protective equipment.

**9.** Appearing as an *amicus curiae*, the United States Secretary of Labor generally agrees

## IV

IBP also disputes the district court's view of the compensable work day. It claims that the district court erred in determining that the compensable work day began with the first act of compensable work. Specifically, IBP argues that workers should not be paid for the time spent walking to and from the Pasco plant stations after donning personal protective equipment. Under § 4 of the Portal–to–Portal Act, employees receive compensation only for "hours worked," i.e., for work occurring during the "workday." 29 U.S.C. § 254(a) (1999); *see also* S.Rep. No. 80–48, at 48 (1947) (defining "workday" as the period "between the commencement . . . and the termination . . . of the principal activity . . . which such employee was employed to perform"); 29 C.F.R. § 790.6(b) (1999) (noting that the "workday" includes "all time within that period whether or not the employee engages in work throughout all of that period"); *cf. id.* §§ 785.16(a), 785.19 (1999). Under § 4, employees have no right to receive overtime compensation for activities that are "preliminary to or postliminary to [a job's] principal activity or activities," 29 U.S.C. § 254(a) (1999), unless those preliminary or postliminary activities are "integral and indispensable [to][ ] the principal activities for which [the employees] are employed." *Steiner*, 350 U.S. at 256, 76 S.Ct. 330; 29 U.S.C. § 254(a) (1999).

The district court properly reasoned that the workday commenced with the performance of a preliminary activity that was "integral and indispensable" to the work, and the district court also properly determined that any activity occurring thereafter in the scope and course of employment was compensable. Thus, the district court included "the reasonable walking time from the locker to work station and back . . . for employees required to don and doff compensable personal protective equipment" in its "compensable" time measure.

*Steiner* compels this conclusion. *Steiner's* "principal activity" term expressly "embraces all activities . . . integral and indispensable" thereto, preliminary or otherwise, 350 U.S. at 252–53, 76 S.Ct. 330 (internal quotation marks omitted); the retrieval and donning of protective equipment are "integral and indispensable" preliminary activities, and, as such, are "embrace[d]" by plaintiffs' "principal [work] activity." *Id.* All activities performed thereafter—such as "walking"—thus occur during the "principal" workday and are compensable. *Id.; see also* 29 C.F.R. § 790.6(b) (1999).

IBP contends that § 254(a)(1) is a "stand alone" provision excluding from compensability any and all "walking, riding, or traveling to and from the actual place of performance of the principal activity" without regard for the "principal activ-

with IBP's definition of the "changing clothes" term, asserting that this phrase covers the donning and doffing of the protective gear we address here. In a June 2002 opinion letter, in fact, the administrator of the Department of Labor's Wage and Hour Division stated that § 3(*o*)'s clothing term "includes the protective safety equipment typically worn by meat packing employees." This position directly conflicts with a 1997 opinion letter from the same Division, in which the administrator concluded that the "plain meaning of 'clothes' in section 3(*o*) does not

encompass protective safety equipment." A January 15, 2001, letter reaffirmed the 1997 letter's conclusion. As the Supreme Court has directed, "[a]n agency interpretation of a relevant provision which conflicts with the agency's earlier interpretation is entitled to considerably less deference than a consistently held agency view," *INS v. Cardoza–Fonseca*, 480 U.S. 421, 446 n. 30, 107 S.Ct. 1207, 94 L.Ed.2d 434 (1987), and we reject the Secretary's new, inconsistent interpretation here.

ity" itself. 29 U.S.C. § 254(a)(1) (1999). However, *Steiner* eschews such a construction and directs us to "embrace" within the "principal activity" all "integral and indispensable" activities thereto. 350 U.S. at 252–53, 76 S.Ct. 330. There is nothing in the statute or regulations that would lead to the conclusion that a workday may be commenced, then stopped while the employee is walking to his station, then recommenced when the walking is done.[10] Plaintiffs were required to obtain their protective gear from their lockers and to be present at their work stations as the first piece of meat arrived; they obviously could not have worked without walking between these places. The district court correctly held that Pasco plant work time was continuous, not the sum of discrete periods.

## V

■ IBP contends that it is shielded from liability by FLSA's good faith defense provisions. *See* 29 U.S.C. §§ 259, 260 (1999). One of these provisions, § 259, "was designed to protect employers from liability if they took certain actions on the basis of an interpretation of the law by a government agency, even if the agency's interpretation later turned out to be wrong." *EEOC v. Home Ins. Co.*, 672 F.2d 252, 263 (2d Cir.1982). In pertinent part, § 259 reads:

> [N]o employer shall be subject to any liability or punishment for or on account of the failure of the employer to pay ... overtime compensation under the [FLSA] ... if he pleads and proves that the act or omission complained of was in good faith in conformity with and in reliance on any written administrative regulation, order, ruling, approval, or interpretation, of [the relevant USDOL

administrator], or any administrative practice or enforcement policy of such agency....

29 U.S.C. § 259(a) (1999).

■ To be insulated from liability under § 259's good faith exception, an employer must "show it acted in (1) good faith, (2) conformity with, and (3) reliance on the DOL's regulations or the Administrator's Opinion Letter." *Frank v. McQuigg*, 950 F.2d 590, 598 (9th Cir.1991). This test has both objective and subjective components, asking how a "reasonably prudent [person] would have acted under the same or similar circumstances" and requiring "that the employer have honesty of intention and no knowledge of circumstances which ought to put him upon inquiry." *Id.* (quoting 29 C.F.R. § 790.15(a) (1900)) (internal punctuation omitted). Section 259's test also places on employers "an affirmative duty to inquire about uncertain [FLSA] coverage issues," *see Keeley v. Loomis Fargo & Co.*, 183 F.3d 257, 271 (3d Cir.1999) (citing 29 C.F.R. § 790.15(b)), putting "the risk of a close [good faith] case on the employer." *Reich,* 38 F.3d at 1127; *see also* 29 C.F.R. § 790.15(d) n. 99 (1999) ("It is not intended that this [good faith] defense [ ] apply where an employer had knowledge of conflicting rules and chose to act in accordance with the one most favorable to him.") (quoting 93 Cong. Rec. 4390 (1947)). The employer bears the burden of proof to establish this exception.

IBP argues that its position (1) was supported by the USDOL's 1990s litigation strategy because that litigation focused on non-unionized plants and, in so focusing, demonstrated an administrative practice and enforcement policy treating unionized plants as exempt from such litigation un-

---

**10.** *But see Tum v. Barber Foods, Inc.*, 331 F.3d 1 (1st Cir.2003) (holding under the facts of that case that such activity was not compensable as part of the workday).

der § 3(*o*), and (2) is bolstered by the supposed good faith it demonstrated in studying and implementing a four-minute compliance plan.

■ The good faith provisions of § 259 do not embrace IBP's conduct. To come within the exception's reach, an employer's acts "must have been taken in reliance on [an] administrative ruling or interpretation." *Home Ins. Co.*, 672 F.2d at 264. By their plain terms, court decisions, agency litigation positions and self-initiated activities are not "administrative rulings or interpretations." The only agency action upon which IBP relies is the enforcement policy putatively evident in the USDOL's 1990s litigation strategy. Despite IBP's contentions to the contrary, however, *Reich* expressed no opinion regarding the § 3(*o*) "clothing" issue, and, in *Reich,* the Tenth Circuit even hinted that IBP's broad "clothing" definition is untenable. 38 F.3d at 1127. As the district court rightly noted, the *Reich* litigation provided IBP "nothing upon which to rely other than its assumptions about what clothes changing and washing were including under 3(*o*)."

As a rule, moreover, litigating positions are regarded quite differently in the law than an "administrative ruling or interpretation." *See, e.g., Bowen v. Georgetown Univ. Hosp.,* 488 U.S. 204, 212, 109 S.Ct. 468, 102 L.Ed.2d 493 (1988); *Resource Invs., Inc. v. U.S. Army Corps of Eng'rs,* 151 F.3d 1162, 1165 (9th Cir.1998). There is a sound basis for the distinction. As the Supreme Court has explained, "Congress has delegated to the administrative official and not to appellate counsel the responsibility for elaborating and enforcing statutory commands." *Investment Co. Inst. v. Camp,* 401 U.S. 617, 628, 91 S.Ct. 1091, 28 L.Ed.2d 367 (1971). Administrative agency constructions of governing statutes are the product of deliberation and analysis by the entity charged with application of the statute. Agency positions developed in litigation, by contrast, are not of the same character: they are specifically tailored to help obtain a favorable outcome in a pending controversy in which the agency is involved. Concessions or settlements within the course of the administrative litigation also may be made for a variety of quite justifiable reasons; however, the contextual underpinnings are dissimilar from agency rule-making.

IBP's four-minute compliance plan, moreover, merely embodies an effort to overcome a settlement impasse in a non–§ 3(*o*) context, offering no conclusion regarding IBP's supposed § 3(*o*) defense or its otherwise FLSA-violative conduct. Under the facts presented by this case, the district court did not err in rejecting IBP's good faith theory.

### VI

■ If a particular employer's conduct embodies "willful violation" of FLSA, 29 U.S.C. § 255(a) permits extension of the FLSA's standard two-year statute of limitations to a three-year period. *McLaughlin v. Richland Shoe Co.,* 486 U.S. 128, 135, 108 S.Ct. 1677, 100 L.Ed.2d 115 (1988); *see* 29 U.S.C. § 255(a) (1999). The determination of willfulness is a mixed question of law and fact, *see Reich v. Monfort,* 144 F.3d 1329, 1334 (10th Cir.1998), and we review mixed questions *de novo* and the factual findings underpinning the determination for clear error. *See Rios v. Rocha,* 299 F.3d 796, 799 n. 4 (2002). The district court did not err in applying § 255's three-year statute of limitations to plaintiffs' FLSA claims. *Cf. Reich v. Monfort,* 144 F.3d at 1334–35.

■ For § 255's extension to obtain, an employer need not knowingly have violated the FLSA; rather, the three-year term can apply where an employer disre-

garded the very "possibility" that it was violating the statute, *Herman v. RSR Sec. Servs. Ltd.*, 172 F.3d 132, 141 (2d Cir. 1999), although we will not presume that conduct was willful in the absence of evidence. *Cox v. Brookshire Grocery Co.*, 919 F.2d 354, 356 (5th Cir.1990).

To prove a particular FLSA violation willful under § 255, the Supreme Court has, in general, required evidence of an employer's "kn[owing] or [ ] reckless disregard for the matter of whether its conduct was prohibited by the statute." *Richland Shoe*, 486 U.S. at 133, 108 S.Ct. 1677 (citing *Trans World Airlines, Inc. v. Thurston*, 469 U.S. 111, 125–30, 105 S.Ct. 613, 83 L.Ed.2d 523 (1985)). We agree with the district court and conclude that "the proof demonstrate[s] [that IBP] recklessly disregarded *the possibility* that [it] was violating the FLSA." *Herman*, 172 F.3d at 141 (emphasis added).

An examination of the record verifies the propriety of the district court's conclusion. IBP was on notice of its FLSA requirements, yet took no affirmative action to assure compliance with them. To the contrary, IBP's actions may more properly be characterized as attempts to evade compliance, or to minimize the actions necessary to achieve compliance.[11] IBP "could easily have inquired into" the meaning of the relevant FLSA terms and the type of steps necessary to comply therewith. *Herman*, 172 F.3d at 142. It failed to do so. The district court appropriately applied § 255's three-year statute of limitations to IBP's willful conduct.

## VII

The district court did not err in awarding liquidated damages under the FLSA, a decision we review for abuse of discretion. *See Local 246 Util. Workers Union v. S. Cal. Edison Co.*, 83 F.3d 292, 298 (9th Cir.1996). For violations of the FLSA's minimum and overtime wage provisions, employers "shall be liable to the . . . employees affected in the amount of . . . overtime compensation, as the case may be, and in an additional equal amount as liquidated damages." 29 U.S.C. § 216(b) (1999); *see Overnight Motor Transp. Co. v. Missel*, 316 U.S. 572, 583–84, 62 S.Ct. 1216, 86 L.Ed. 1682 (1942) (observing that FLSA liquidated damages are not penalties exacted by law, but, rather, compensation to the employee occasioned by the delay in receiving wages due). Under 29 U.S.C. § 260, courts need not award liquidated damages in every instance; instead, courts retain discretion to withhold a liquidated damages award, or to award less than the statutory liquidated damages total, where an employer shows that, "despite the failure to pay appropriate wages, the employer acted in subjective 'good faith' and had objectively 'reasonable grounds' for believing that the acts or omissions giving rise to the failure did not violate the FLSA." *Herman*, 172 F.3d at 142; *see* 29 C.F.R. § 790.17(i) n.110 (1999) (observing that an employer's inability to satisfy § 259 does not preclude a court from finding that the employer met § 260's terms).[12]

---

**11.** Contrary to IBP's assertion, *Service Employees International Union Local 102 v. County of San Diego*, 60 F.3d 1346 (9th Cir. 1994), is inapposite because the record in that case did not reflect any knowing or reckless conduct.

**12.** Section 260 provides in relevant part:

> In any action . . . to recover unpaid minimum wages, unpaid overtime compensation, or liquidated damages, under the [FLSA], if the employer shows to the satisfaction of the court that the act or omission giving rise to such action was in good faith and that he had reasonable grounds for believing that his act or omission was not a violation of the [FLSA], the court may, in its

■ To satisfy § 260, a FLSA-liable employer bears the "difficult" burden of proving both subjective good faith and objective reasonableness, "with double damages being the norm and single damages the exception." *Herman,* 172 F.3d at 142 (citing *Reich v. S. New Eng. Telecomm. Corp.,* 121 F.3d 58, 71 (2d Cir.1997)); *see also Dole v. Elliott Travel & Tours,* 942 F.2d 962, 968 (6th Cir.1991). Where the employer "fails to carry that burden," we have noted, "liquidated damages are mandatory." *Local 246,* 83 F.3d at 297 (citations omitted).

IBP "failed to take the steps necessary to ensure[its] [ ] practices complied with [FLSA]." *Herman,* 172 F.3d at 142. Mistaking ex post explanation and justification for the necessary affirmative "steps" to ensure compliance, IBP offers no evidence to show that it actively endeavored to ensure such compliance. Instead, it reiterates the value of its read of *Reich,* of USDOL litigation strategy, and of its four-minute compliance plan. IBP's efforts do not constitute evidence of taking the steps necessary to ensure FLSA compliance, and, without such evidence, we cannot say that the district court abused its discretion in awarding liquidated damages. *See Cox,* 919 F.2d at 357 ("[Even] [a] finding that the employer did not act willfully does not preclude an award of liquidated damages.") (citation omitted).

sound discretion, award no liquidated damages or award any amount thereof. . . .
29 U.S.C. § 260 (1999).

**13.** Plaintiffs contend that IBP has waived this issue by raising it only in a pretrial motion for summary judgment. In generally, we will not review on appeal from a final judgment on the merits issues raised only on summary judgment, *see Locricchio v. Legal Services Corp.,* 833 F.2d 1352, 1359 (9th Cir.1987), but there is an exception to this rule where, as

## VIII

■ The district court rejected IBP's contention[13] that it was exempt from the State of Washington's overtime wage provisions[14] because it fell within the "agricultural worker" exemption to those provisions, which provides that the overtime provisions do not apply to:

individual[s] employed (i) on a farm, in the employ of any person, in connection with the cultivation of the soil, or in connection with raising or harvesting any agricultural or horticultural commodity, including raising, shearing, feeding, caring for, training, and management of livestock, bees, poultry, and furbearing animals and wildlife, or in the employ of the owner or tenant or other operator of a farm in connection with the operation, management, conservation, improvement, or maintenance of such farm and its tools and equipment; or (ii) in packing, packaging, grading, storing or delivering to storage, or to market or to a carrier for transportation to market, any agricultural or horticultural commodity; or (iii) commercial canning, commercial freezing, or any other commercial processing, or with respect to services performed in connection with the cultivation, raising, harvesting, and processing of oysters or in connection with any agricultural or horticultural commodity after its deliv-

here, judgment was entered after a bench trial and the issue on appeal is one purely of law.

**14.** Washington's baseline overtime-wage provision, Wash. Rev.Code § 49.46.130 (1999), reads in pertinent part: "[N]o employer shall employ any of his employees for a work week longer than forty hours unless such employee receives compensation for employment in excess of the hours above specified at a rate not less than one and one-half times the regular rate at which he is employed."

ery to a terminal market for distribution for consumption....

Wash. Rev.Code § 49.46.130(2)(g) (1999).

As the district court observed, "[t]his subsection only applies to farm employment, and under no construction could IBP's plant be deemed a farm." However, the district court acknowledged that some of the language in the subsection could be subject to a broader construction. However, given the statutory context, the consistent interpretations of the section by the Washington Department of Labor and Industries ("WDLI"), and Washington case law, the district court concluded that the agricultural exemption did not apply to the Pasco plant workers. Rather, the district court concluded that, for purposes of applying the exemption, "[t]he bright line is when an agricultural product is *first* marketed, *i.e.,* conveyed by someone who raised it, to someone who did not." (Emphasis in district court order). Given the statutory and regulatory context, as well as the principles of statutory construction governing this area of law announced by the Washington Supreme Court, the district court did not err in assessing how the Washington Supreme Court would decide the issue.

Under Washington law, statutory "meaning is [to be] discerned from all that the Legislature has said in the statute and related statutes which disclose legislative intent about the provision in question." *Dep't of Ecology v. Campbell & Gwinn, L.L.C.,* 146 Wash.2d 1, 43 P.3d 4, 10 (2002) (En Banc). In particular, the Washington Supreme Court has directed courts construing the WMWA to heed the "terms and spirit" of the Act overall and of the individual exemption at issue. *Drinkwitz v. Alliant Techsystems, Inc.,* 140 Wash.2d 291, 996 P.2d 582, 587 (2000). The "spirit" of Washington's labor code is plainly employee-protective. Washington's "long and proud history of being a pioneer in the protection of employee rights," *id.* at 586, has, through the years, manifest in "a strong policy in favor of payment of wages due employees [and in] a comprehensive [statutory] scheme to ensure [such] payment." *Int'l Ass'n of Fire Fighters, Local 46 v. City of Everett,* 146 Wash.2d 29, 42 P.3d 1265, 1267 (2002) (second alteration in original; internal quotation marks omitted). The "spirit" of Revised Code of Washington § 49.46.130(2)(g), in turn, is substantially narrower than IBP suggests, aiming to exclude from WMWA's protections only those individuals employed in agriculture or horticulture during the relatively short harvest season. As in the FLSA context, we must construe exemptions to the WMWA narrowly such that only contexts "plainly and unmistakably consistent with the terms and spirit of the legislation" fit therein. *Id.* The individual plaintiffs do not "plainly and unmistakably" fall within § 49.46.130(2)(g)'s ambit.

▮ To the extent that the statute contains ambiguity, we agree with the district court that the Washington Supreme Court would likely afford deference to the state agency's interpretation. Under Washington law, deference is owed the state agency interpretation of a state statute that the agency enforces, "if the law being interpreted is within[that] agency's expertise." *Budget Rent A Car Corp. v. Wash. Dep't of Licensing,* 144 Wash.2d 889, 31 P.3d 1174, 1180 (2001) (En Banc). In this case, the district court attached significance to the WDLI policy that the agricultural worker exemption does not apply to employees in commercial processing of any agricultural commodities grown or raised by another. Several WDLI officials testified as to this policy, and a 1997 enforcement letter from WDLI declares that the statutory exemption "should be strictly and narrow-

ly construed to exempt" only workers performing labor "immediately necessary to complete the successful operation of the agricultural/horticultural enterprise." Although this policy interpretation does not bind us, it provides an additional persuasive indication of how the Washington Supreme Court likely would decide the question.

Thus, in view of the principles of statutory construction applicable under Washington law, the district court did not err in determining that the Washington Supreme Court would likely hold that the agricultural exemption is inapplicable to the IBP packing plant employees.[15]

## IX

▆▆▆ The Washington Minimum Wage Act, like the FLSA, requires employers to compensate employees at, at least, a minimum wage rate. *See* Wash. Rev.Code § 49.46.020 (1999). Some courts have held that, under the FLSA, an employee's right to recover minimum wage accrues each workweek, not by individual hour. *See Dove v. Coupe,* 759 F.2d 167, 172 (D.C.Cir. 1985); *see also* 29 U.S.C. § 206(a) (1999) ("Every employer shall pay [a minimum wage] to each of his employees who in any workweek is engaged in commerce or in the production of goods for commerce...."). We must determine whether the WMWA similarly provides only a right to minimum wages based on a workweek standard or whether, in contrast, employees retain a per-hour right to minimum wage under Washington law.

Washington state courts have yet to determine whether hourly-employees, like plaintiffs, have a per-hour or a work-week right to minimum wage. *See Seattle Prof'l Eng'g Employees Ass'n ("SPEEA") v. Boeing Co.,* 92 Wash.App. 214, 963 P.2d 204, 225 (1998) (expressly refusing to "address whether compliance with the WMWA should be evaluated on an hourly or workweek basis"), *as amended by* 92 Wash.App. 214, 963 P.2d 204 (1998) (same). The district court concluded that Washington courts were "likely" to adopt the per-hour standard for hourly employees. We agree.

The district court relied on three bases for its conclusion. First, the WMWA omits the phrase "in any workweek," which is contained in the relevant portion of the FLSA. Second, the district court drew significance from the fact that, in *SPEEA,* the trial court used a per-hour measure and the Washington Supreme Court refused to criticize this aspect of the trial court's methodology. Third, it deferred to the WDLI interpretation that, for hourly workers, the WDLI employs the per-hour standard for determining minimum wage compliance.

We believe the district court's analysis is persuasive. Regulations interpreting the WMWA are similarly telling in this regard. Repeatedly listing "hourly" employment as a separate employment type, these regulations permit use of the work-week measure only for particular employment categories. *See, e.g.,* Wash. Admin. Code § 296–128–550 (1999); *id.* § 296–126–021 (1999); *id.* § 296–126–010 (1999). Were the Washington legislature disposed to apply the workweek measure to hourly employees, it could have done so as expressly as it did vis-a-vis other employment types. And were the workweek measure to be

---

**15.** We need not address whether federal law preempts application of Washington state law in this case, for IBP did not properly raise this preemption argument on appeal. *See Devereaux v. Abbey,* 263 F.3d 1070, 1079 (9th Cir.2001) ("As a general matter, '[w]e review only issues which are argued specifically and distinctly in a party's opening brief.' ") (citation omitted; alteration in original).

generally and necessarily applicable, the Washington legislature's specification of the workweek standard for, e.g., commissioned employees would be both extraneous and redundant.

Given this statutory and regulatory background, the district court quite reasonably predicted that the Washington Supreme Court would construe the WMWA as using a per-hour standard for hourly employees.

## X

 In unequivocal terms, Wash. Admin. Code § 296–126–092 requires that "[e]mployees shall be allowed a meal period of at least 30 minutes." Wash. Admin. Code § 296–126–092(1) (1999). Such "meal period[s]" are to "commence[ ] no less than two hours nor more than five hours from the beginning of [an employee's] shift," and such meal periods "shall be" on the employer's time—i.e., shall be paid—"when the employee is required by the employer to remain on duty on the premises or at the prescribed work site in the interest of the employer." Id.

WDLI, appearing as an amicus curiae, asserts that Wash. Admin.Code § 296–126–092 evinces a "clear, 'bright-line' standard": it requires employers to provide meal-breaks of "at least 30 minutes," and it demands that employers interrupting meal-breaks "pay for the entire meal break, regardless of the length and the number of the work-interruptions or curtailments." Cf. Brennan v. Elmer's Disposal Serv., Inc., 510 F.2d 84, 88 (9th Cir.1975) ("An employee cannot be docked for lunch breaks during which he is required to continue with any duties related to his work."). The district court construed this provision as compensating a particular employee only for minutes lost if that employee lost less than or as many as ten minutes of his or her meal-break time

to work duty, and awarding compensation for the full thirty-minute term only where an employee lost more than ten minutes of his or her meal-break time to work duty. Cf. 29 C.F.R. §§ 785.18 & 785.19 (1999) (permitting employers to reduce meal-breaks to twenty minutes under "special conditions"; specifying the thirty-minute rule as one that need only "ordinarily" be followed); S. New Eng. Telecomm. Corp., 121 F.3d at 63–65 (applying § 785.19 in a "practical manner"); see also Roy v. County of Lexington, 141 F.3d 533, 544–45 (4th Cir.1998) (adopting a "predominant benefit" test in assessing meal-break claims under FLSA).

Although perhaps consistent with the FLSA, the district court's interpretation conflicts with the terms of the mandatory language of Wash. Admin. Code § 296–126–092. Unlike the correlative FLSA provisions, which permit truncation of the thirty-minute period in certain contexts, see 29 C.F.R. §§ 785.18 & 785.19 (1999), neither Wash. Admin. Code § 296–126–092 nor its interpretative guides permit any mitigation of the section's mandatory thirty-minute duty-free directive. See Wash. Admin. Code § 296–126–092(1) (expressly noting that employees "shall be allowed" a thirty-minute meal-break); see also Wash. State Liquor Control Bd. v. Wash. State Pers. Bd., 88 Wash.2d 368, 561 P.2d 195, 200 (1977) (En Banc) ("[A]s a general rule, the use of the word 'shall' in a statute is imperative and operates to create a duty . . . ."). Without reference to or acceptance of the kind of "special circumstances" posited in 29 C.F.R. § 785.19, Wash. Admin. Code § 296–126–092(1) requires "a meal period of at least 30 minutes." Id. No intrusions on this thirty-minute period are condoned or even acknowledged; indeed, WDLI's most recent evaluation of this provision notes that "[i]f the meal period should be interrupted due

to the employee's performing a task ... [t]he entire meal period must be paid without regard to the number of interruptions." Wash. State Dep't of Labor and Indus., Administrative Policy ES.C.6 (2002), *available at http://www.lni. wa.gov/scs/workstandards/policies /esc6.htm.*

The plain words of the statute buttress WDLI's interpretation, and we owe WDLI's construction deference under Washington law. *Wash. State Liquor Control Bd.,* 561 P.2d at 200 ("The construction of a rule by the agency which promulgated it is entitled to great weight."); *Drinkwitz,* 996 P.2d at 591 (discussing Washington's "long and proud history of being a pioneer in the protection of employee rights"). Under Wash. Admin. Code § 296–126–092, plaintiffs are owed compensation for the full thirty-minute period where IBP has intruded upon or infringed the mandatory thirty-minute term to any extent. We thus reverse the district court's decision to bifurcate its Wash. Admin. Code § 296–126–092 award, and we remand for recalculation of damages consistent with this full thirty-minute remuneration approach.

## XI

■ As the Supreme Court noted in *Mt. Clemens,* a court may "award damages to [an] employee, even though the [award] be only approximate." 328 U.S. at 688, 66 S.Ct. 1187. Heeding *Mt. Clemens* "approximate" term, the Tenth Circuit, in *Reich,* affirmed a damage award based on "reasonable time" measures where "differences in personal routines occurred at the end of [a] shift." 38 F.3d at 1127.

Charting a similar course, the district court attached "the compensable time for each activity [ ] [to] the basis of a reasonable time, rather than the actual time required for each activity." The use of rea-

sonable time in this instance was within the district court's discretion. *Mt. Clemens,* 328 U.S. at 687–88, 66 S.Ct. 1187; *see Reich,* 38 F.3d at 1127; *Skipper v. Superior Dairies, Inc.,* 512 F.2d 409, 420 (5th Cir.1975).

First, we respectfully disagree with the plaintiffs' read of the district court's damage and time analyses. The district court did not make "actual" time findings only to disregard them, and district court did not rely on a misconception of the concept of "work." We do not disagree with plaintiffs, of course, that the definition of "work" is not fixed, in most instances, to an objective measure of "reasonableness." *See Brock v. City of Cincinnati,* 236 F.3d 793, 802–03 (6th Cir.2001); *Holzapfel v. Town of Newburgh,* 145 F.3d 516, 522–24 (2d Cir.1998). But we cannot agree with the plaintiffs' use of this thesis here. In arguing that the district court misunderstood "work," plaintiffs conflate a determination that a "reasonable" time sufficed for damage calculation where myriad internal "differences" permeated a class-wide award with a determination that a specific plaintiff's "work" was not itself "reasonable." The district court made the former, but it did not make the latter; that is, the district court did not conclude that any particular plaintiff's "work" was unreasonable or inherently non-compensable. *Cf. Holzapfel,* 145 F.3d at 524. Rather, the district court adopted—as the Tenth Circuit did in *Reich*—a compensation measure based on a "reasonable" quantification of plaintiffs' work time, thereby avoiding countless individual plaintiff-specific quagmires while directing the parties to individualize the damage measure to the extent possible nevertheless.

■ Second, the district court's approach is consistent with our settled case law. We have approved "approximate[d]" awards where plaintiffs can establish, to an

imperfect degree of certainty, that they "ha[ve] performed work and ha[ve] not been paid in accordance with the [FLSA]." *Brock v. Seto*, 790 F.2d 1446, 1448 (9th Cir.1986) (internal quotation marks omitted; final alteration in original). In such instances, "[t]he only uncertainty is the *amount* of damage," not the fact that damages are due. *Id.* Where an "approximate [ ] award based on reasonable inferences" forms a satisfactory surrogate for unquantified and unrecorded "actual" times, an approximated award is permissible. *Id.* at 1449. The district court's compensation framework adheres to this test.

We recognize, of course, that approximated time and reasonable time are not synonymous categories. As the courts in *Holzapfel* and *Brock* suggest, in certain contexts, "individual traits and needs of [each employee] [may] preclude any easy determination as to what is a 'reasonable time.'" *Holzapfel*, 145 F.3d at 526; *see Brock*, 236 F.3d at 802. In contexts in which work tasks are not uniform and are less subject to dilatoriness, that which is "approximate" may not always be "reasonable." But the nature of the work at issue in this case, and, notably, the relatively uniform tasks performed by plaintiffs, conduce to the kind of analysis performed by the district court, and the district court did not abuse its discretion in its damage calculation.

## XII

IBP contends that the district court erred in holding that there was an implied cause of action for violation of Wash. Admin. Code § 296–126–092 in Wash. Rev. Code § 49.12 (1999). However, after briefing of this appeal, the Washington Supreme Court held that an implied private right of action did exist under the statute, thus foreclosing this argument. *See Wingert*, 50 P.3d at 261.

## CONCLUSION

For the foregoing reasons, we affirm in part and reverse in part the judgment of the district court. We remand for recalculation of damages. Each party to bear their own costs.

**AFFIRMED in part; REVERSED in part; REMANDED.**