Kenneth SISK, Terrence Ward, Theorda Randle, and William Binder, on behalf of themselves and all other similarly situated individuals, Plaintiffs,

v.

SARA LEE CORPORATION, Jimmy Dean Foods, and Bryan Foods Incorporated, Defendants.

No. 1:07–cv–01095 JPM.

United States District Court,
W.D. Tennessee,
Western Division.

Sept. 25, 2008.

Brian P. McCafferty, Kenney Egan McCafferty & Young, PC, Plymouth Meeting, PA, Michael Hamilton, Provost Umphrey, LLP, Nashville, TN, for Plaintiffs.

Anneliese Wermuth, Joseph E. Tilson, Meckler Bulger & Tilson, LLP, Chicago, IL, Maurice Wexler, Angie C. Davis, Baker Donelson Bearman Caldwell & Berkowitz, Memphis, TN, for Defendants.

## ORDER GRANTING DEFENDANT BRYAN FOODS INCORPORATED'S MOTION FOR SUMMARY JUDGMENT; ORDER OF DISMISSAL

JON PHIPPS McCALLA, District Judge.

Before the Court is Defendant Bryan Foods Incorporated's ("Bryan") Motion for

Summary Judgment (Doc. 32), filed October 22, 2007. Plaintiffs responded in opposition on November 26, 2007 (Doc. 36). Bryan filed a reply to Plaintiffs' response on December 27, 2007 (Doc. 43). Plaintiffs filed Notices of Filing Supplemental Authorities on February 18, 2008, March 17, 2008, April 15, 2008, and June 16, 2008 (Docs. 56, 73, 77, and 88, respectively). Bryan filed similar notices on February 18, 2008, April 21, 2008, June 19, 2008, and July 14, 2008 (Docs. 57, 79, 89, and 95, respectively). A hearing was held on February 21, 2008.

For the following reasons, Bryan's Motion for Summary Judgment is GRANTED.

## I. BACKGROUND

### A. Factual Background

The issues relevant to this motion arise from Plaintiffs' employment at Bryan's West Point, Mississippi, hog slaughtering and processing plant (the "plant").[1] (First Am. Representative Action Compl. ("Am. Compl.") (Doc. 20) ¶ 12.) Bryan closed the plant on March 31, 2007. (*Id.* ¶ 2.) Employees at the plant wore different types of protective clothing that varied with their particular job description. All production and maintenance employees wore some combination of protective gear, including hair and beard nets, ear plugs, hard hats, rubber and/or cotton gloves, frocks/white coats, and rubber steel-toed boots, collectively referred to as "standard equipment." (Aff. of John A. Reicks ("Reicks Aff.") (Doc. 32–7) ¶ 12.) Bryan required employees who used knives or other cutting utensils to wear some combination of additional equipment, including belly guards, arm guards, scabbards/knife pouches, cut-resistant gloves, and cut-resistant sleeves, collectively referred to as "specialized personal protective equipment," or "specialized PPE." (*Id.* ¶ 13.) The majority of employees at the plant worked in the Fresh Pork Departments, which required the use of cutting utensils, and these employees therefore wore specialized PPE, as did a small number of employees outside of the Fresh Pork Departments. (Aff. of James E. Murray ("Murray Aff.") (Doc. 32–10) ¶¶ 9, 13.)

While the plant was open, its 1200 hourly employees were represented by the United Food and Commercial Workers Local 1991 (the "Union"). (Reicks Aff. ¶ 6.) At all relevant times, the parties operated under the terms of collective bargaining agreements ("CBAs") between Bryan and the Union.[2] (*Id.* ¶ 9.) Bryan paid employees in the Fresh Pork Departments under a scheme called "gang time," in which a shift is measured from the time the first piece of meat arrives at a particular station until the time the last piece of meat leaves that station. (*Id.* ¶ 15.) Bryan paid employees in other departments from the time they punched in on the time clock until they punched out at the end of the day, (*Id.* ¶ 16), and those employees who wore specialized PPE in these other departments donned, doffed, and cleaned their specialized PPE while on the clock. (Murray Aff. ¶ 13.) All hourly employees received at least one fifteen-minute break during their shift and one thirty-minute unpaid lunch period. (Reicks Aff. ¶ 17.)

---

1. Bryan is the wholly-owned subsidiary of Sara Lee Corporation. (Am.Compl.¶ 12.)

2. The relevant agreements include the agreement effective from January 30, 1997, to January 30, 2000 (the "1997 CBA"), the agreement effective from January 30, 2000, to January 30, 2004 (the "2000 CBA"), and the agreement effective from January 30, 2004, to the closing of the plant (the "2004 CBA"). (*Id.* ¶ 9.) Each of these CBAs is silent on the subject of compensation for time spent donning and doffing specialized PPE. (Murray Aff. ¶ 26.)

Employees in the Fresh Pork Departments donned, doffed, and cleaned their specialized PPE before their shifts began and after their shifts ended. (Am. Compl.¶ 3.) Because these employees were paid under gang time, the time spent donning, doffing, and cleaning was off the clock. (*Id.*) Until 2002, Bryan paid these employees for an additional ten to fifteen minutes per day for the time spent handling their specialized PPE. (Murray Aff. ¶ 11.) In 2001 and 2002, Bryan and the Union commissioned joint time studies to determine if this system adequately compensated the employees. (*Id.*¶ 15.) Based on the agreed-upon results of these studies, in December of 2002, Bryan revised its pay practices by paying employees in the Fresh Pork Departments who wore specialized PPE up to an addition ten minutes per day beyond gang time for time spent donning, doffing, and cleaning their specialized PPE. (*Id.* ¶¶ 16–17.) Employees in the Fresh Pork Departments who wore only standard equipment received no additional compensation beyond their gang-time pay. (*Id.* ¶ 18.) Bryan continued these revised pay practices through the closing of the plant. (Reicks Aff. ¶ 21.)

### B. Procedural Background

The original complaint in this action, filed May 7, 2007, alleged violations of the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 201, *et seq.*, against Sara Lee Corporation regarding pay practices at its meat-processing plants in Newbern, Tennessee, and West Point, Mississippi. (Original Representative Action Compl. (Doc. 1).) Specifically, Plaintiffs claimed unpaid wages and unpaid overtime wages for time spent handling PPE, performing other activities related to their job functions, and walking between work sites. (*Id.* ¶ 3.) On May 10, 2007, Plaintiffs filed a notice of consents to join thirty-three opt-in plaintiffs to the suit. (Doc. 4.)[3] Plaintiffs filed an amended complaint on June 20, 2007, adding Jimmy Dean Foods, operator of the Newbern plant, and Bryan, operator of the West Point plant, as defendants. (Am.Compl. n. 1.)

On January 22, 2008, Plaintiffs filed a Motion for Conditional Certification as a Collective Action Pursuant to the FLSA. (Doc. 51.) Before the Court ruled on that motion, however, Plaintiffs withdrew the motion to certify and stipulated to the dismissal of each plaintiff except Theorda Randle and William Binder. (*See* Docs. 74, 84, 87, 90, 93, 97.) The only claims remaining in this case, therefore, are Plaintiffs Randle and Binder's claims against Bryan regarding its West Point plant. Plaintiffs Randle and Binder worked at the plant during the relevant time period.[4] (Reicks Aff. ¶¶ 10–11.)

Bryan now moves for summary judgment on Plaintiffs' remaining claims on the basis that §§ 203(*o*) and 259 of the FLSA preclude liability.

## II. STANDARD OF REVIEW

Under Federal Rule of Civil Procedure 56(c), summary judgment is proper "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c); *see also Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). So long as

---

3. Plaintiffs later filed a notice of seven additional opt-in plaintiffs, bringing the total to forty. (Doc. 50.)

4. The statute of limitations for willful violations under the FLSA is three years, and therefore the relevant time period begins on May 7, 2004, three years before Plaintiffs filed this action on May 7, 2007, and ends with the closing of the plant on March 31, 2007. *See* 29 U.S.C. § 255(a).

the movant has met its initial burden of "demonstrat[ing] the absence of a genuine issue of material fact," *Celotex*, 477 U.S. at 323, 106 S.Ct. 2548, and the nonmoving party is unable to make such a showing, summary judgment is appropriate. *Emmons v. McLaughlin*, 874 F.2d 351, 353 (6th Cir.1989). In considering a motion for summary judgment, however, "the evidence as well as all inferences drawn therefrom must be read in a light most favorable to the party opposing the motion." *Kochins v. Linden–Alimak, Inc.*, 799 F.2d 1128, 1133 (6th Cir.1986); *see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

When confronted with a properly-supported motion for summary judgment, the nonmoving party "must—by affidavits or as otherwise provided in this rule—set out specific facts showing a genuine issue for trial." Fed.R.Civ.P. 56(e)(2); *see also Abeita v. TransAmerica Mailings, Inc.*, 159 F.3d 246, 250 (6th Cir.1998). However, " '[t]he mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient.' " *Street v. J.C. Bradford & Co., Inc.*, 886 F.2d 1472, 1479 (6th Cir.1989) (*quoting Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)).

A genuine issue of material fact exists for trial "if the evidence [presented by the nonmoving party] is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 447 U.S. at 248, 100 S.Ct. 2124. In essence, the inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id.* at 251–52, 100 S.Ct. 2124.

## III. ANALYSIS

Bryan first argues that the activities for which Plaintiffs seek payment are excluded from compensable activities by section 3(*o*) of the FLSA. Bryan argues in the alternative that, regardless of whether those activities are actually compensable, 29 U.S.C. § 259 provides a complete defense and insulates Bryan from liability. The Court will address each argument in turn.

### A. Donning and Doffing

The purpose of the FLSA, enacted in 1938, was to counteract "labor conditions detrimental to the maintenance of the minimum standard of living necessary for health, efficiency, and general well-being of workers." 29 U.S.C. § 202(a). The FLSA created, among other things, a maximum workweek and a requirement for overtime compensation. 29 U.S.C. § 207. In response to expansive judicial interpretation of the FLSA, Congress enacted the Portal–to–Portal Act of 1947, which purported to exclude from compensable work "activities which are preliminary to or postliminary to [the] principal activity or activities [that the employee is employed to perform]." 29 U.S.C. § 251, 254(a)(2).

Enacted in 1949, section 3(*o*) of the FLSA was intended to close a "loophole" in the Portal–to–Portal Act, providing:

> Hours Worked.—In determining for the purposes of sections 206 and 207 of this title the hours for which an employee is employed, there shall be excluded any time spent in changing clothes or washing at the beginning or end of each workday which was excluded from measured working time during the week involved by the express terms of or by custom or practice under a bona fide collective-bargaining agreement applicable to the particular employee.

FLSA § 3(*o*), 29 U.S.C. § 203(*o*); *Anderson v. Cagle's, Inc.*, 488 F.3d 945, 958 (11th Cir.2007). In effect, to claim an

exemption from compensable time for certain activity under section 3(o), a defendant must show that (1) the activity constitutes "changing clothes," and (2) the activity was excluded from working time "by custom or practice" under a valid CBA. *See, e.g., In re Cargill Meat Solutions Wage & Hour Litig.*, 3:06–cv–00513–WJN (M.D.Pa. Apr. 10, 2008) (filed in this case as Doc. 77–2).

### 1. "Changing clothes"

The Court must first determine whether the donning and doffing activities at issue constitute "changing clothes" for the purposes of section 3(o). In making this determination, the Court must first decide the degree of deference to be accorded to the interpretation of section 3(o) given by the Department of Labor (DOL).

### a. Interpretation by the DOL

The DOL has issued four opinion letters discussing the applicability of section 3(o) to the type of donning and doffing at issue in the instant case. In 1997, the DOL addressed "the following preliminary and postliminary activities: sharpening knives, waiting in line at wash stations, cleaning equipment, and putting on and taking off required safety gear" in the meatpacking industry. Wage & Hour Div., U.S. Dep't of Labor, Opinion Letter, 1997 WL 998048 (Dec. 3, 1997) ("1997 DOL opinion letter"). Based on its interpretation that, "[s]ince section 3(o) provides an exemption from the broad, remedial provisions of the FLSA, it must be read narrowly," the DOL found that "by its very terms section 3(o) does not apply to the putting on, taking off, and washing of protective safety equipment, and, therefore, time spent on these otherwise compensable activities cannot be excluded from hours worked." *Id.* The DOL went on to explain,

The plain meaning of "clothes" in section 3(o) does not encompass protective safety equipment; common usage dictates that "clothes" refer to apparel, not to protective safety equipment which · is generally worn over such apparel and may be cumbersome in nature. In regard to the meaning of "washing," the legislative history specifically states that the term refers only to washing oneself. . . . Thus, section 3(o) cannot be read so broadly as to include the cleaning of protective safety equipment.

Therefore, the phrase "changing clothes or washing" in section 3(o) does not include the putting on, taking off, or washing of that protective safety equipment utilized in the meat packing industry which is integral to the performance of an employee's principal activity. Moreover, the phrase clearly does not encompass the sharpening of knives.

*Id.* (internal citations omitted). This position was reiterated in a second opinion letter from the DOL issued on January 15, 2001. Wage & Hour Div., U.S. Dep't of Labor, Opinion Letter, 2001 WL 58864 (Jan. 15, 2001) ("2001 DOL opinion letter").

On June 6, 2002, the DOL issued a new opinion letter that withdrew the two previous letters and changed the position of the DOL. Wage & Hour Div., U.S. Dep't of Labor, Opinion Letter, 2002 WL 33941766 (June 6, 2002) ("2002 DOL opinion letter"). The DOL stated that "[i]t is our view, based upon a reexamination of the statute and legislative history, that the 'changing clothes' referred to in section 3(o) applies to the putting on and taking off of the protective safety equipment typically worn in the meat packing industry."[5] The letter went on to explain that the term

---

**5.** The DOL maintained its position that "washing" referred only to "washing of the person" and not to cleaning equipment. *Id.*

"changing clothes or washing" was not defined in, nor was its plain meaning evident from, the statute.[6] *Id.* The DOL reviewed the Supreme Court's decisions in *Anderson v. Mt. Clemens Pottery Co.,* 328 U.S. 680, 66 S.Ct. 1187, 90 L.Ed. 1515 (1946), in which the Court "found compensable, as a necessary prerequisite to the employees' production work, such preliminary activities as putting on aprons and overalls, removing shirts, taping or greasing arms, putting on finger sheaths, preparing equipment, turning on switches for lights and machinery, opening windows, and assembling and sharpening tools." 2002 DOL Opinion Letter. The DOL also reviewed *Steiner v. Mitchell,* 350 U.S. 247, 255–56, 76 S.Ct. 330, 100 L.Ed. 267 (1956), in which the Court found the changing of clothes and showering required of battery plant workers was compensable because such activity was integral to the production of batteries. 2002 DOL Opinion Letter.

> In stating that the Act invalidates such agreements in the case of protective gear in the meat packing industry, the 1997 opinion letter confined its reasoning to a single sentence where it explained that "clothes" has a "plain meaning" which excludes (i) "protective articles" that (ii) may be "cumbersome in nature" and (iii) are "worn over ... apparel." Upon review, we have concluded that none of these qualities should prohibit a company and union from regarding the gear worn in the meat packing industry as clothes for purposes of section 3(*o*).

*Id.*

To support its new position, the DOL cited its own regulation's description of a face shield as "protective clothing," as well as the Supreme Court's use of the phrase "protective clothing" on two occasions. *Id.* The DOL stated affirmatively that whether an article is "cumbersome" does not determine whether it is "clothing," as

> [i]t would disserve the workers the Fair Labor Standards Act is meant to protect if employers who wished to introduce bulkier and more protective gear in the workplace knew that in doing so they would lose their ability to bargain with their union over the compensability of donning and doffing protective gear.... In addition to lacking basis in the statutory text and legislative intent, a distinction between apparel that is "cumbersome" and that which is not is vague, difficult to administer, and fails to provide useful guidance to employers and unions regarding the legitimate parameters of their agreements and practices.

*Id.* The DOL also found that "clothing" is defined by whether it is worn "on top of another item." *Id.* Finally, the DOL found that it was "reasonable to assume that when Congress enacted section 3(*o*), it had in mind the kind of 'clothing' at issue in the *Mt. Clemens* case just three years earlier; that case involved aprons and overalls, shirts and finger sheaths." *Id.* As the DOL concluded,

> we believe that the term "clothes" in section 3(*o*) includes protective safety equipment typically worn by meat packing employees. Accordingly, we interpret "clothes" under section 3(*o*) to include items worn on the body for covering, protection, or sanitation, but not to include tools or other implements such as knives, scabbards, or meat hooks.

*Id.*

In an opinion letter issued on May 14, 2007, the DOL reiterated this position on

---

6. The DOL noted that "[o] ne dictionary defines 'clothes' as 'garments for the body; articles of dress; wearing appeal,' and another defines 'clothes' as *'articles,* usually of cloth, designed to cover, *protect* or adorn the body.'" *Id.* (citations omitted)(emphasis added by the DOL).

section 3(*o*). Wage & Hour Div., U.S. Dep't of Labor, Opinion Letter, 2007 WL 2066454 (May 14, 2007) ("2007 DOL opinion letter"). First, the DOL explained that "activities covered by section 3(*o*) cannot be considered principal activities and do not start the workday. Walking time after a 3(*o*) activity is therefore not compensable unless it is preceded by a principal activity." *Id.* The letter went on to adopt the position and reasoning of the 2002 letter, concluding that "clothing" includes "heavy protective safety equipment worn in the meat packing industry such as mesh aprons, sleeves and gloves, plastic belly guards, arm guards, and shin guards." *Id.* The DOL addressed a Ninth Circuit opinion that rejected the 2002 DOL opinion letter, *Alvarez v. IBP, Inc.,* 339 F.3d 894 (2003), *aff'd on other grounds,* 546 U.S. 21, 126 S.Ct. 514, 163 L.Ed.2d 288 (2005), and stated that the DOL "has not changed its interpretation as a result of the circuit court's opinion." *Id.*

### b. Deference

The DOL opinion letters receive deference in accordance with *Skidmore v. Swift & Co.,* 323 U.S. 134, 140, 65 S.Ct. 161, 89 L.Ed. 124 (1944), under which "[t]he weight of such a judgment in a particular case will depend upon the thoroughness evident in its consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors which give it power to persuade, if lacking power to control." *See also Gonzales v. Oregon,* 546 U.S. 243, 269, 126 S.Ct. 904, 163 L.Ed.2d 748 (2006) ("[U]nder *Skidmore,* we follow an agency's rule only to the extent it is persuasive."); *Fazekas v. Cleveland Clinic Found. Health Care Ventures, Inc.,* 204 F.3d 673, 677 (6th Cir.2000)(applying *Skidmore* deference to opinions of the DOL and finding that such opinions have "persuasive value if the position of the Administrator is well-considered and well-reasoned").

■ In the instant case, the Court finds that deference to the 2002 and 2007 DOL opinion letters is appropriate. Both the 2007 opinion and, in particular, the 2002 opinion exhibit a thorough analysis of whether protective equipment constitutes "clothes" under section 3(*o*). The 2002 opinion, for example, discusses Supreme Court interpretation and usage of the relevant terms, as well as dictionary definitions and other DOL regulations using the word "clothing." The opinion further analyzes limitations placed on the definition of "clothes," such as whether the article is cumbersome or worn over other clothes, and comes to the conclusion that such limitations are not warranted.

Some courts have taken issue with the inconsistency between the 2002 and 2007 opinion letters and the 1997 and 2001 opinion letters. *See, e.g., Alvarez,* 339 F.3d at 905 n. 9 (*citing INS v. Cardoza–Fonseca,* 480 U.S. 421, 446 n. 30, 107 S.Ct. 1207, 94 L.Ed.2d 434 (1987)("An agency interpretation of a relevant provision which conflicts with the agency's earlier interpretation is 'entitled to considerably less deference' than a consistently held agency view." (citations omitted))) (rejecting the "new, inconsistent interpretation" of the 2002 opinion letter because it "directly conflicts with" the 1997 opinion letter). However, as discussed by the Eleventh Circuit in *Anderson v. Cagle's, Inc.* in deferring to these letters,

> [w]hile less deference may be called for, the most recent advisory opinion is entitled to some deference just the same. Moreover, this most recent opinion provides a far more detailed rationale for its conclusion than the previous opinions. Thus, all things being equal, the more recent opinion is a great deal more persuasive than the earlier ones.

488 F.3d 945, 956–57 (11th Cir.2007). This Court agrees that, although the 2002 and

2007 opinions represent a shift from the 1997 and 2001 opinions issued by the DOL, the latter opinions are more thorough and based on a more sound interpretation of the statute. For these reasons, the Court finds that the 2002 and 2007 DOL opinion letters are worthy of deference.

### c. Application

■ The Court concludes that the specialized PPE at issue here constitutes "clothes" for purposes of section 3(*o*). In addition to the findings of the DOL, as discussed above, the Court finds that these items are "clothes" consistent with the common, ordinary meaning ascribed to the word. *See, e.g., United States v. Plavcak,* 411 F.3d 655, 660 (6th Cir.2005)("A fundamental canon of statutory construction is that, unless otherwise defined, words will be interpreted as taking their ordinary, contemporary, common meaning." (*citing Perrin v. United States,* 444 U.S. 37, 100 S.Ct. 311, 62 L.Ed.2d 199 (1979))); *Webster's Ninth New Collegiate Dictionary* 251 (Frederick C. Mish et al. eds., 1991)(defining "clothes" as "clothing," which is defined as "garments in general"). A broad reading of the phrase "changing clothes" also comports with the purpose of section 3(*o*), which was to strengthen the already employer-protective Portal-to-Portal Act. *Cagle's,* 488 F.3d at 957–58 (discussing the legislative history of section 3(*o*)). *But see Alvarez,* 339 F.3d at 905 (adopting a narrow construction of section 3(*o*) and requiring the protective gear at issue to fit "plainly and unmistakably" within the term "clothing").

The Court also notes the different outcomes reached by other courts when presented with the same question. *Compare Kassa v. Kerry, Inc.,* 487 F.Supp.2d 1063, 1066–67 (D.Minn.2007)(finding that "hair nets, beard nets, safety glasses, and uniforms consisting of a shirt, pants, and a smock" were "clothes" under section 3(*o*)), *Anderson v. Pilgrim's Pride Corp.,* 147

F.Supp.2d 556, 561, 564–65 (E.D.Tex.2001), *aff'd per curiam,* 44 Fed.Appx. 652 (5th Cir.2002)(assuming, without discussion, that hairnets, ear plugs, rubber boots, and gloves were "clothes" under 3(*o*)), *and Saunders v. John Morrell & Co.,* 1991 WL 529542, at *1, *3–4 (N.D.Iowa Dec.24, 1991)(assuming, without discussion, that gloves, goggles, helmets, arm guards, belly guards, knife guards, steel-toed shoes, rubber boots, and steel-mesh aprons were "clothes" under 3(*o*)), *with Perez v. Mountaire Farms, Inc.,* 2008 WL 2389798, at *5 (D.Md. June 10, 2008)(refusing to accept "an overly expansive definition of 'clothes' that does not distinguish between everyday clothing and personal protective gear"), *Spoerle v. Kraft Foods Global, Inc.,* 527 F.Supp.2d 860, 867–68 (W.D.Wis.2007)(holding that section 3(*o*)'s use of "clothes" refers only to "something the employee would normally wear anyway," or a replacement for such clothing, and not "safety and sanitation equipment" that is "uniquely job-related" and "under the employer's control"), *and Gonzalez v. Farmington Foods, Inc.,* 296 F.Supp.2d 912, 916, 930–31 (N.D.Ill.2003)(relying on *Alvarez* and finding that "a helmet, a frock, a plastic apron, an arm guard, a belly guard, a plastic arm sleeve, a variety of gloves . . ., a hook, a knife holder, a chida . . ., and knives" were not "clothes" under section 3(*o*)).

In light of the conflicting lines of precedent, the Court will defer to the interpretation by the DOL that the specialized PPE at issue here are "clothes" within the meaning of section 3(*o*).

### 2. Custom or Practice

To take advantage of the preclusion from liability afforded by section 3(*o*), Bryan must also show that there was a custom or practice existing at the plant, under a bona fide CBA, throughout the

relevant time period, of not compensating employees for their donning and doffing activities. In the instant case, the donning and doffing time at issue is any additional time employees in the Fresh Pork Departments spent donning, doffing, and cleaning their specialized PPE beyond the ten minutes per day for which they were compensated.[7] The parties agree that the governing CBAs were silent on compensation for these activities. Rather than relying on the express terms of a CBA, Bryan argues that the silence of the 2004 CBA on the subject of such activities satisfies the "custom or practice" requirement of section 3(o). Plaintiffs respond that Bryan's actual practice was to pay employees for donning and doffing activities, rather than exclude such activities, and so there was no custom or practice of noncompensation.

The Court finds that a custom or practice of noncompensation was in place at the Bryan plant. Parties are not required to undergo formal negotiations to create a custom or practice under a bona fide CBA; rather, "a particular custom or practice can become an implied term of a labor agreement through a prolonged period of acquiescence." *Turner v. City of Phila.*, 262 F.3d 222, 226 (3d Cir.2001)(*citing,* among others, *Detroit & Toledo Shore Line R.R. v. United Transp. Union,* 396 U.S. 142, 90 S.Ct. 294, 24 L.Ed.2d 325 (1969); *see also Cagle's,* 488 F.3d at 958–59 ("[A] policy concerning compensation (or noncompensation, as the case may be) for clothes changing, written or unwritten, in force or effect at the time a CBA was executed satisfies § 203(o)'s requirement of a 'custom or practice under a bona fide' CBA.").

As discussed above, Bryan had a general policy before December of 2002 of paying Fresh Pork Departments employees for an additional ten to fifteen minutes for don-

ning and doffing activities. After December of 2002, Bryan paid these employees for an additional ten minutes. Each of the CBAs in effect over this period of time was silent on the issue of compensation for these activities. Therefore, the Court finds that the Union acquiesced in Bryan's donning and doffing compensation practice. A custom or practice of noncompensation for any time over ten minutes spent donning or doffing the specialized PPE was in place under a bona fide CBA for the purposes of section 3(o).

For these reasons, the Court finds that compensation for Plaintiffs' donning and doffing of specialized PPE is precluded by section 3(o), and Bryan's Motion for Summary Judgment as to these activities is GRANTED.

**B. Activities Following Donning and Doffing**

In addition to time spent donning and doffing, Plaintiffs seek compensation for time spent "obtaining and sanitizing sanitary and safety equipment[;] obtaining tools, equipment and supplies necessary for performance of their work[;] 'working' steels and all other activities in connection with these job functions[;] and walking between work sites after the first compensable work activity and before the last compensable work activity." (Am.Compl.¶ 3.) Plaintiffs argue that, even if section 3(o) precludes recovery for donning and doffing time, these other activities are compensable, as section 3(o) is limited to "time spent in changing clothes or washing at the beginning or end of each workday." FLSA § 3(o), 29 U.S.C. § 203(o).

█ Under the continuous workday rule, "the 'workday' is generally defined as 'the period between the commencement

---

**7.** As discussed above, employees who wore specialized PPE outside of the Fresh Pork Departments completed their donning and doffing while on the clock.

and completion on the same workday of an employee's principal activity or activities.'" *IBP, Inc. v. Alvarez,* 546 U.S. 21, 29, 126 S.Ct. 514, 163 L.Ed.2d 288 (2005)(*quoting* 29 C.F.R. § 790.6(b)). However, employees must be compensated for preliminary and postliminary activities if they are "an integral and indispensable part of the principal activities." *Steiner v. Mitchell,* 350 U.S. 247, 256, 76 S.Ct. 330, 100 L.Ed. 267 (1956).

Of critical importance to the Court's analysis here is whether the donning and doffing activities already determined to be covered by section 3(*o*) are nonetheless "principal activities" for purposes of the continuous workday rule. In other words, the analysis will depend upon whether the classification of an activity as within section 3(*o*) precludes its classification as a principal activity, notwithstanding a determination that the activity is "integral and indispensable."

■ The Supreme Court has expressly held that predonning waiting time is not a principal activity, nor is it "integral and indispensable" to a principal activity, and is excluded from the scope of the FLSA. *IBP,* 546 U.S. at 41–42, 126 S.Ct. 514.[8] The Court therefore finds that any time spent waiting to commence the section 3(*o*) activities is not compensable, regardless of whether those activities are principal activities.

Moreover, the Court finds that once an activity has been deemed a section 3(*o*) activity, it cannot be considered a principal activity. This finding is in accordance with the 2007 DOL opinion letter, which the Court has already determined worthy of deference, stating that a section 3(*o*) activity is not a principal activity. *See* 2007 DOL opinion letter ("[A]ctivities covered by section 3(*o*) cannot be considered prin-

cipal activities and do not start the workday. Walking time after a 3(*o*) activity is therefore not compensable unless it is preceded by a principal activity."). In addition, the Court agrees with Bryan that an alternative finding would lead to the illogical result in which a section 3(*o*) activity, if determined to be a principal activity, would not be compensable but would begin the workday, converting otherwise noncompensable activity, such as walking time incurred after completing the section 3(*o*) activity, into compensable activity. (*See* Bryan's Reply (Doc. 43), at 18.) Therefore, to avoid the preclusive effect of the combination of section 3(*o*) and the continuous workday rule, Plaintiffs must show that their claimed activities are themselves either principal activities or are integral or indispensable to a principal activity.

■ Plaintiff has offered no evidence regarding their pre- or post-shift activities. In contrast, Bryan offers evidence that employees were compensated up to an additional ten minutes per day to perform pre- and post-shift activities. (Murray Aff. ¶ 17.) Plaintiffs present no evidence regarding the types of pre- and post-shift activities for which Plaintiffs seek compensation, the time spent on these activities, or the compensation actually received for these activities. Because Bryan has demonstrated the absence of a genuine dispute of material fact as to whether Plaintiffs performed activities not covered by section 3(*o*) for which they were not compensated, the Court need not address whether these activities are principal activities, and Bryan's Motion for Summary Judgment as to these activities is GRANTED.

## C. Good Faith Defense

■ Finally, Bryan argues that, despite its actual liability for Plaintiffs' claims, the

---

**8.** Section 3(*o*) was not at issue in *IBP,* and therefore the case offers no guidance on whether section 3(*o*) activities can be principal activities.

FLSA provides a complete defense against those claims. As stated in 29 U.S.C. § 259,

no employer shall be subject to any liability or punishment for or on account of the failure of the employer to pay minimum wages or overtime compensation under the [FLSA] if he pleads and proves that the act or omission complained of was in good faith in conformity with and in reliance on any written administrative regulation, order, ruling, approval, or interpretation, of the [DOL], or any administrative practice or enforcement policy of such agency with respect to the class of employers to which he belonged. Such a defense, if established, shall be a bar to the action or proceeding, notwithstanding that after such act or omission, such administrative regulation, order, ruling, approval, interpretation, practice, or enforcement policy is modified or rescinded or is determined by judicial authority to be invalid or of no legal effect.

"To be insulated from liability under § 259's good faith exception, an employer must 'show it acted in (1) good faith, (2) conformity with, and (3) reliance on the DOL's regulations or the Administrator's Opinion Letter.'" *Alvarez v. IBP, Inc.*, 339 F.3d 894, 907 (9th Cir.2003) *aff'd on other grounds*, 546 U.S. 21, 126 S.Ct. 514, 163 L.Ed.2d 288 (2005)(*quoting Frank v. McQuigg*, 950 F.2d 590, 598 (9th Cir. 1991)).

**1. Good faith**

■ "An employer who acts in reliance on an administrative ruling will have acted 'in good faith so long as the ruling remained unrevoked and the employer had no notice of any facts or circumstances which would lead a reasonably prudent man to make further inquiry as to whether the employees came within the act's provisions.'" *Marshall v. Baptist Hosp., Inc.*, 668 F.2d 234, 237 n. 2 (6th Cir.1981) (*quot-*

*ing* 29 C.F.R. § 790.15 ("[T]he employer's 'good faith' is not to be determined merely from the actual state of mind.... '[G]ood faith' also depends upon an objective test—whether the employer ... acted as a reasonably prudent man would have acted under the same or similar circumstances.")).

■ Plaintiffs argue that Bryan revised its compensation policy in 2000 and 2001, while the 1997 and 2001 DOL opinion letters were in effect, and so it could not have been acting in good faith because its policy was contrary to those opinions. However, the undisputed evidence shows that Bryan conducted time studies in 2000 and 2001 in an effort to determine whether employees were adequately compensated for their non-shift time. (Murray Aff. ¶ 15.) Bryan therefore acted in good faith by making "inquiry as to whether the employees came within the act's provisions." *See Marshall*, 668 F.2d at 237 n. 2. Furthermore, Bryan cannot be said to have acted in bad faith when it chose to continue compensating employees for pre- and post-shift activities, despite the 2002 DOL opinion letter indicating that the non-shift activities were not compensable. Bryan acted reasonably and in good faith in relying on the opinions of the DOL, which indicated that Bryan was not violating the law.

**2. Conformity**

Plaintiff next argues that Bryan did not act in conformity with the DOL opinion letters because those opinions dealt only with section 3(*o*), and Plaintiff has raised claims for activities falling outside the scope of section 3(*o*). The DOL did not indicate until 2007 its opinion that these activities are not compensable. However, it cannot be said that Bryan did not act in conformity with the 2002 opinion merely because it did not yet have the benefit of the 2007 opinion's clarification. In addi-

tion, the undisputed evidence shows that employees were compensated up to ten minutes per day for these activities, and so if it were the opinion of the DOL in 2002 that these activities were compensable, Bryan acted in conformity with that opinion. Furthermore, even if some of these other activities constitute principal activities that require compensation, Bryan has shown that it did compensate employees for time spent on these activities, up to ten minutes per day. The Court therefore finds that Bryan acted in conformity with the 2002 DOL opinion letter.

### 3. Reliance

Plaintiffs finally argue that Bryan did not rely on the opinions of the DOL because it cannot show actual reliance on those opinions. *See, e.g.,* 29 C.F.R. § 790.16(a) ("[T]he employer must also prove that he actually relied upon [the administrative opinion]."). Specifically, Plaintiffs argue that Bryan has indicated that it revised its compensation policy in response to the joint time studies conducted in 2000 and 2001, and so it could not have relied on the 2002 DOL opinion letter in making those revisions. The Court finds no reason to require that Bryan revise its policy in response to only one source of information, and as the evidence shows, Bryan was aware of the 2002 opinion letter before the revised pay practices were implemented in December of 2002. (Murray Aff. ¶ 30.) Bryan has demonstrated that its decision to revise its policy was influenced by both the time studies and the 2002 DOL opinion letter, and therefore the Court finds that Bryan has shown that it relied on the DOL's opinion.

Bryan meets the requirements of § 259 in that it relied in good faith on, and acted in conformity with, the 2002 DOL opinion letter. Bryan's liability under the FLSA is foreclosed by this good faith reliance, and therefore Bryan's Motion for Sum-

mary Judgment on this issue is GRANTED.

## IV. CONCLUSION

For the reasons discussed, the Court GRANTS Bryan's Motion for Summary Judgment. Plaintiffs' claims are hereby DISMISSED with prejudice.